**KOPPERS COMPANY, INC., Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 84–3701.

United States Court of Appeals,
Third Circuit.

Argued June 19, 1985.
Decided July 8, 1985.

Robert L. Collings (argued), Kenneth R. Myers, William F. Mongan, Morgan, Lewis & Bockius, Philadelphia, Pa., and Templeton Smith, Koppers Co., Inc., Pittsburgh, Pa., for petitioner; Kenneth A. Rubin, Morgan, Lewis & Bockius, Washington, D.C., of counsel.

F. Henry Habicht, II, Asst. Atty. Gen., Land & Natural Resources Div., Scott E. Slaughter (argued), Margaret M. Strand, Michael W. Steinberg, Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Pamela E. Savage, Atty., for respondent; Gerald H. Yamada, Acting Gen. Counsel, Susan G. Lepow, Asst. Gen. Counsel, E.P.A., Washington, D.C., of counsel.

Before ALDISERT, Chief Judge, GIBBONS, Circuit Judge, and BECHTLE, District Judge.*

## OPINION OF THE COURT

PER CURIAM.

In this appeal we must review the propriety of a decision by the Administrator of the Environmental Protection Agency that a variance provision of the Clean Water Act does not apply to pretreatment standards. Because we hold that the Administrator's decision was not arbitrary or capricious, we deny the petition for review.

### I.

Koppers Company has two merchant coke manufacturing plants at Erie, Pennsylvania and Toledo, Ohio that are "pretreaters." Pretreaters send their wastestreams to publicly owned treatment works ("POTW") for additional treatment prior to the POTW's discharge of the wastestreams into navigable waters. By July 10, 1985, the two Koppers plants must comply with EPA-promulgated pretreatment standards for existing sources in the cokemaking subcategory of the iron and steel manufactur-

---

* Honorable Louis C. Bechtle of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

ing point source category. 40 C.F.R. § 420.05, .15(b) (1984).

Koppers requested that EPA modify the categorical pretreatment standards for ammonia and phenols at its two plants and impose less stringent standards pursuant to § 301(g) of the Clean Water Act. 33 U.S.C. § 1311(g). On July 31, 1984, the EPA Administrator took final action denying Koppers' § 301(g) variance request on the ground that § 301(g) does not authorize modification of categorical pretreatment standards.

## II.

■ Koppers argues that, for various reasons, the Administrator's denial of its variance request was based upon an erroneous interpretation of the Clean Water Act. In *National Association of Metal Finishers v. EPA*, 719 F.2d 624 (3d Cir. 1983), *rev'd on other grounds*, — U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), this court established the standard of review of such an agency action:

Under section 10(e) of the Administrative Procedure Act, we may not invalidate agency actions unless we find them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). This standard sets the level of deference with which we must review the agency's actions for their statutory authority, substantive validity and procedural regularity....

We must extend "great deference to the interpretation given the statute by the officers or agency charged with its administration." ... If an act is susceptible to more than one reasonable interpretation, we must accept any reasonable interpretation chosen by the agency.... If the agency rejects the reasonable interpretation of the statute, however, we must "honor the clear meaning of a statute, as revealed by its language, purpose and history."

*Id.* at 636–37 (citations omitted). The Administrator's decision must therefore be upheld if his interpretation of the statute is reasonable, or put another way, appellant must show that the interpretation was unreasonable.

## III.

■ We believe that this narrow standard of review is dispositive of this case. The petitioner has not met its burden of showing that the Administrator's decision was unreasonable. We therefore will deny the petition for review on the basis of the reasons set forth by William D. Ruckelshaus, the Administrator of the EPA, in his letter to the petitioner denying the variance, app. at 25–31, which is set forth in full in the appendix to this opinion.

## APPENDIX

July 31, 1984

Templeton Smith, Esquire

Koppers Company, Inc.

Law Department

Pittsburgh, Pennsylvania 15219

Item I–8

Dear Mr. Smith:

This responds to your letters of February 21, 1983, June 7, 1983 and May 26, 1984 requesting variances under section 301(g) of the Clean Water Act ("CWA" or "Act") from applicable pretreatment standards for existing sources for Koppers Company, Inc.'s ("Koppers") merchant coke plants in Erie, Pennsylvania and Toledo, Ohio. After a careful analysis of each of your submissions, I have concluded that I lack the authority to grant section 301(g) variances from pretreatment standards for existing sources. The CWA authorizes section 301(g) variances only from effluent limitations for direct dischargers. It does not allow 301(g) variances from pretreatment standards for introduction of pollutants ("indirect discharges") to a publicly owned treatment works ("POTW").

Section 301(b)(2)(A) of the CWA provides that there shall be achieved, for specified pollutants, effluent limitations which: (i) will require application of best available technology economically achievable

("BAT") which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants; or, (ii) in the case of the introduction of a pollutant into a POTW, compliance with applicable pretreatment requirements. Section 301(g) authorizes me, with the concurrence of the State, to modify the requirements of section 301(b)(2)(A) with respect to the discharge of nonconventional pollutants if the point source can make a satisfactory showing that the modified requirements will meet certain conditions. Since section 301(g) refers to section 301(b)(2)(A) generally, not just to subsection (i) of section 301(b)(2)(A), you have suggested that section 301(g) may authorize modification of pretreatment standards as well as modification of BAT effluent limitations. However, a careful reading of the statute, review of the legislative history, and consideration of the practical effects of trying to apply section 301(g) to pretreatment standards demonstrate that the 301(g) modification is available only for discharges directly to receiving waters. I have set forth below some of the specific factors which led me to reach this conclusion.

First, the language of the Act appears to limit the applicability of a 301(g) modification. Section 301(g) authorizes a modification "with respect to the discharge of any [non-conventional] pollutant" in certain circumstances. As defined in section 502(12), the term "discharge of a pollutant" in the Clean Water Act is a very precise term:

"(12) The term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."

The legislative history of section 502(12) strongly suggests that for purposes of section 301(g) the first phrase in the definition, "addition[s] ... to navigable waters," means direct additions.

In the Senate bill leading to the 1972 Act, S. 2770, 91st Cong., 1st Sess., *reprinted in,* 2 A Legislative History of Water Pollution Control Act Amendments of 1972, 93 Cong. 1st Sess. (1973) (hereafter "Legis.His.") 1534 *et seq.,* the original version of the section 502(12) definition contained the two concepts found in the Act—additions to navigable waters and certain additions to the contiguous zone or ocean. However, in that bill, the definition also included a third element: "(3) any addition of any pollution [sic] to publicly owned treatment works ... by any industrial user." S. 2770, § 502(n), 2 Legis. His. 1699. When the House of Representatives considered the definition of "discharge" for the 1972 Water Pollution Control bill, it deleted the third portion of the Senate's definition, thereby specifically eliminating reference to additions of pollutants to POTW's. H.R. 11896, 1 Legis.His. 893 *et seq.; see* section 501(13) at 1069–1070. The Conference Report, S.Rep. No. 92–1236, 1 Legis.His. 326, succinctly describes the change:

"The definitions of the terms (in section 502) are basically the same as provided in the Senate bill except as hereafter noted: ... (4) discharges by industrial users into publicly owned treatment works are excluded from the definition of the term 'discharge of a pollutant'. ..."

The deletion was deliberate and important. The House Report, H.R.Rep. No. 92–911, 92nd Cong.2d Sess. (1972), 1 Legis.His. 753 *et seq.,* cautions that in order to understand the bill, it must be recognized that certain terms have very specific and technical meanings, and it recommends that "very special attention be accorded to section 502." It then lists some of the section 502 terms which the House considers particularly important. This includes the definition of discharge. *See* 1 Legis.His. 762–763.

In addition, Senator Muskie's explanation of the Conference bill reiterates the limited scope of the section 502(12) definition:

"The term 'discharge' is a word of art in the legislation. It refers to the actual discharge from a point source into the

navigable waters, territorial seas or the oceans. It does not refer to the contribution of waste by a point source to a treatment facility....

"The Conferees discussed at some length whether or not such contribution from discharges by point sources should be subject to section 306 [sic] or should be required to obtain a permit under section 402 as required by the Senate bill. The Conferees agreed that no specific permit would be required for any industrial users subject to sections 204, 307 or 308 contributing to a municipal waste treatment plan, but that the permit for the municipal waste treatment plant would set forth the requirements imposed on the industrial user."[1]

1 Legis.His. 178.

Accordingly, the term "discharge" as used in the CWA refers to additions directly to the receiving waters.[2] Section 301(g) authorizes the Administrator to modify the requirements of section 301(b)(2)(A) with respect to "the discharge of any pollutant...." Therefore, section 301(g), by its terms, appears to apply only to direct dischargers.

This analysis is consistent with the terms of section 301(b)(2)(A). Subsection (b)(2)(A)(i) requires the application of BAT "which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants...." Subsection (b)(2)(A)(ii) does not establish any requirements for "discharges," but only for "the introduction" of a pollutant into a POTW. Section 301(g) makes no mention of any modification of requirements of subsection (b)(2)(A) with respect to introductions of pollutants.

This conclusion is also consistent with the terms of section 301(j)(1)(B). That section establishes the deadline for 301(g) applications, requiring them to be filed "not later than 270 days after the date of promulgation of an applicable effluent guideline under section 304 or not later than 270 days after the date of enactment of the Clean Water Act of 1977, whichever is later." Pretreatment requirements are deemed standards, not effluent guidelines. If Congress had intended that section 301(g) provide modification of pretreatment standards, section 302(j)(1)(B) would also have established filing deadlines triggered by publication of pretreatment standards under sections 304 and 307. The absence of such a deadline further shows that no section 301(g) modification of pretreatment standards was contemplated.

Second, the relationship between section 301(g) and section 301(c) also lends support to the view that section 301(g) modifications are only available for direct dischargers. Section 301(c), established as part of the 1972 amendments, authorizes the Administrator to modify a source's BAT requirements based on economic considerations. The section allows a modification "with respect to any point source for which a permit application is filed...." The reference to permit applications demonstrates that only direct discharges qualify for 301(c) variances. The subsection was added to the 1972 bill during the conference, when the conferees were well aware that only direct dischargers were required to obtain permits.

Although the reference to permit applications in section 301(c) and the absence of a similar reference in section 301(g) might suggest that section 301(g) modifications

---

**1.** One Congressman, not a member of the Conference Committee, expressed the contrary view, but the Act and Senator Muskie's explanation confirm that subsequent implementation limiting "discharge" to direct dischargers has been correct. *See* 1 Legis.His. 255.

**2.** Congress has not been wholly consistent in its use of the term "discharge" having occasionally used that term in cases which clearly contemplate an introduction to a POTW. In my view, this occasional use simply reflects a tendency of the legislators to use the most common term for industrial effluent outflows. The sporadic inadvertent use of the term "discharge" in contexts where the provision is obviously limited to introductions to POTW's does not warrant a blanket disregard, in all settings, of a term which was unquestionably selected in the first instance as a carefully drawn and very precise term of art.

should be available to indirect dischargers as well, the legislative history of the Act leads to the contrary conclusion. In 1977, when Congress added section 301(g), it clearly viewed this section as a corollary to section 301(c). Congress specifically decreed that where a point source applies for a modification under section 301(g), it will be eligible to apply for a section 301(c) modification only during the same time period as it is eligible to apply for the 301(g) modification. In this way, Congress clearly linked 301(g) to the direct discharge 301(c) provision.

Various references in the legislative history similarly link the two modification provisions. For example, Representative Claussen, a member of the Conference Committee, stated:

"For industrial discharges other than known toxics and conventional pollutants, we also establish a requirement for BAT, with compliance phased in between 1984 and 1987, and with waivers permitted on the basis of water quality needs and the economic capability of the industrial discharger."

3 Legis.His. 370. *See also* remarks of Rep. Roberts, 3 Legis.His. 331, and of Sen. Muskie, 3 Legis.His. 456.

Since section 301(c) is unambiguously limited to direct discharges, and 301(g) can fairly be considered a companion modification, it is probable that Congress similarly viewed section 301(g) as available only to direct discharges.

Third, even if section 301(g) did apply to pretreatment standards, by its terms it would be available only for contributions to a limited number of POTW's. Section 301(g) authorizes modification of requirements under section 301(b)(2)(A). Section 301(b)(2)(A)(ii) in turn refers to introductions of pollutants into POTW's which meet the requirements of section 301(b)(2)(B). That section required POTW's to achieve the best practicable waste treatment technology ("BPWTT") requirements of section 201(g)(2) by a specified date. The 1981 CWA amendments repealed section 301(b)(2)(B). Pub.L. 97–117, section 21 (De-cember 29, 1981). Accordingly, there is no longer any requirement in section 301 for POTW's to meet BPWTT as a separate requirement beyond secondary treatment, and many POTW's in fact do not do so. At best, therefore, only industrial sources contributing to POTW's which meet BPWTT would qualify for a modification of their pretreatment requirements. It seems unlikely that Congress would have designed such a limited modification or, if it had, that it would have supplied no explanation in the legislative history for this restriction. The more probable interpretation is that Congress did not intend indirect dischargers to obtain a pretreatment modification under section 301(g).

Fourth, confusion results when examining the section 301(g) requirement that any modified requirements must comply with section 301(b)(1)(A) which refers to the requirement to meet best practicable control technology currently available ("BPT") and applicable pretreatment standards. If the variance is available for pretreatment standards, indirect dischargers would still have to comply with applicable pretreatment requirements under section 301(b)(1)(A). However, in most instances, EPA promulgates only a single pretreatment standard; separate "BPT level" pretreatment standards exist for only a few industries. In particular, no BPT level pretreatment standards exist for the iron and steel point source category, of which Koppers is a member. Development of BPT level pretreatment standards for individual 301(g) situations would be time consuming; further, there is no assurance that it would be correct to develop new pretreatment standards since "applicable" pretreatment standards would already exist in the form of the BAT-level pretreatment standards from which the modification is requested. Here again, it seems unlikely that Congress intended this confusing state, which is avoided by an interpretation that no pretreatment modification is available under section 301(g).

Fifth, there is no affirmative suggestion in the Act or in the legislative history to

indicate that Congress expected the section 301(g) modification to apply to pretreatment standards. Neither section 301(g) itself nor the legislative history raises specific cautions, as would be appropriate if the section applied to pretreatment standards, against giving a modification without assuring that the modified limitations would not interfere with the operation of the POTW or prevent sludge use or disposal options. Each of these matters was of particular concern to the Congress in 1977. There is no provision assuring that 301(g) modifications would conform with applicable local pretreatment requirements (since section 301(b)(1)(C) only assures compliance with State-level laws or regulations). *Cf.* 3 Legis.His. 45–7, cautioning that nothing in the 1977 amendments preempts any State or local requirement. There is no provision, analogous to the 301(g)/301(c) link, to assure that any 301(g) modification request be considered simultaneously with the possible revisions of pretreatment requirements provided in the amended section 307(b). Finally, where Congress recognized, during the debate on the 1977 Conference bill, that pretreatment requirements may require significant expenditures by some industries, there is no suggestion that 301(g) modifications would be available to alleviate these burdens. *See, e.g.,* 3 Legis.His. 404.

Finally, consideration of the practical effects of applying section 301(g) to introductions of industrial effluent into a POTW further suggests that Congress did not intend to extend the 301(g) modification to pretreatment standards. Section 301(g) is a water quality based modification: to succeed in its request, an applicant must demonstrate the water quality impact of its modified effluent limitation. In the case of the introduction of pollutants into a POTW for treatment prior to discharge, the individual pollutant mixes in the sewer and in the POTW with other pollutants of industrial and/or domestic origin. Both simple mixing and complex chemical changes may occur which can greatly alter the applicants' outflow upon discharge from the POTW. In most cases, no direct correlation could ultimately be made between the individual source's pollutant and the water quality impact of the entire POTW's discharge. Any demonstration of the effect of modifying a single component of a single contributor in this setting would be extremely complex.

In the case of discharges from industrial users, POTW's are concerned with several factors not directly related to water quality. Increased health and safety risks to POTW personnel, sewer deterioration and flow obstruction, adverse treatment process impacts, degraded sludge quality and increased treatment and sludge disposal costs are all possible consequences of the introduction of nonconventional pollutants into a POTW. Section 301(g) is not designed to deal with these broader concerns. When the singularly rigorous water quality precautions of the section are considered, the absence of any concern for these additional possible consequences that would attend a pretreatment modification is striking.

Congress did not deal with any of these serious questions. Instead, it admonished EPA to establish an expeditious 301(g) process. Clearly, the more complex the issues, the less expeditious the process would become. For these reasons also, it appears that Congress did not intend section 301(g) to be available for pretreatment requirements.

In light of the preceding, I must conclude that section 301(g) does not authorize a variance from pretreatment standards. Accordingly, I have no authority to issue such a variance under current procedures for issuance of variances nor to promulgate regulations to do so. This decision constitutes final Agency action for purposes of § 509(b) of the CWA, 33 U.S.C. § 1369(b).

Sincerely,

/s/ William D. Ruckelshaus