**ATLANTIC STATES LEGAL FOUNDATION, INC. and Rainbow Alliance For a Clean Environment, Plaintiffs,**

v.

**COLONIAL TANNING CORPORATION, Defendant.**

**ATLANTIC STATES LEGAL FOUNDATION, INC. and Rainbow Alliance For a Clean Environment, Plaintiffs,**

v.

**TWIN CITY LEATHER CORPORATION, Defendant.**

Nos. 90–CV–801, 90–CV–896.

United States District Court, N.D. New York.

July 19, 1993.

Peter Henner, Albany, NY, for plaintiffs in both actions.

Murphy, Niles Law Firm (Carmel J. Greco and Michael W. Smirtic, of counsel), Johnstown, NY, for defendant Colonial Tanning and defendant Twin City Leather.

## MEMORANDUM & ORDER ON RECONSIDERATION

McAVOY, Chief Judge.

The above captioned actions, *Atlantic States Legal Foundation, Inc. v. Colonial Tanning Corporation*, 90–CV–896, and *Atlantic States Legal Foundation, Inc. v. Twin City Leather Corporation*, 90–CV–801, are citizen suits brought by plaintiffs pursuant to the Clean Water Act for defendants' alleged violations of certain federally imposed effluent limitations. In April, 1992 the court rendered oral decisions on cross motions for summary judgment in both cases. In all material respects those decisions are indistinguishable. Having considered the arguments presented, the court granted defendants' cross-motions for summary judgment in part and denied plaintiff's motions in their entirety. Insofar as those rulings are relevant here, the court held that plaintiffs lacked standing as to some of their claims, and in that respect granted partial summary judgment for defendants. Also, the court ruled that it would only consider violations listed in the complaints and the intent to sue letters attached thereto. Based upon those oral decisions, orders were entered on June 30, 1992.

Since that time, plaintiffs have moved for reconsideration of those decisions contending that the court erred in its interpretation of the law governing citizen suit standing under the Clean Water Act, 33 U.S.C. §§ 1251–1387 ("the Act"), and that the court erred in limiting the scope of the complaint. Also on reconsideration, plaintiffs argue that the court should grant summary judgment in their favor in both cases. Defendants in both cases have opposed reconsideration. This constitutes the court's decision on the motion for reconsideration, and shall be entered by the clerk as the court's order in both cases.

## I

### (a) Introduction:

Both actions are brought pursuant to § 505 of the Act, 33 U.S.C. § 1365. This

section authorizes citizen suits under the Act against "any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter ...", 33 U.S.C. § 1365(a)(1). The complaints allege that the defendants discharges are in violation of 33 U.S.C. §§ 1311(a)[1] and 1317(d)[2], and § 17-0825 of the New York State Environmental Conservation Law[3]. Plaintiffs seek declaratory and injunctive relief, the payment of civil penalties, and an award of attorney and expert witness fees.

Plaintiffs are two environmental organizations which have as their primary purpose the protection of the environment. Atlantic States Legal Foundation ("Atlantic") is a national organization, based in Syracuse, New York and Rainbow Alliance for a Clean Environment ("Rainbow") is an organizational member of Atlantic whose membership is largely based in Fulton County, New York. Defendants are tanning facilities located in the Gloversville–Johnstown area. Pursuant to wastewater permits issued by the Gloversville Johnstown Joint Sewer Board (JSB), defendants discharge wastewater into the Gloversville Johnstown Joint Wastewater Treatment Facility ("the facility"), a publicly owned treatment works.

The JSB permits set forth certain effluent limitations for concentrations of pollutants in the wastewater. However, in addition to the permit limitations, the defendants are also subject to federal categorical pretreatment limits which have been established by the Environmental Protection Agency (EPA) pursuant to 40 C.F.R. § 403. The specific limitations for the tanning industry are set forth at 40 C.F.R. § 425.

The defendants' wastewater, and that of other local dischargers, is treated by the facility. Once the wastewater is treated, it is discharged by the facility directly into the Cayudetta Creek.[4] However, like defendants, the facility is similarly constrained by effluent limitations. The facility discharges its wastewater pursuant to a New York State Pollutant Discharge Elimination System (SPDES) permit. The SPDES permit states that the limitations on influent—that is, the wastewater received by the facility from defendants and other indirect dischargers—which are imposed by the JSB permits shall constitute pretreatment standards under 33 U.S.C. § 1317(d). Thus any violation of a discharge permit limitation, or any violation of the limits imposed by the Code of Federal Regulations, constitutes a violation of an effluent limitation under § 1317(d), and is actionable under 33 U.S.C. § 1365. In their complaints, plaintiffs allege that defendants have exceeded the applicable effluent standards on numerous occasions.

According to plaintiffs, two members of Rainbow, Robert Galinsky and William Dievendorf, regularly recreate on the shores of Cayudetta Creek. The complaint alleges that they are offended by the foul smell and dirty color of the creek, which according to the complaint, is a result of the defendants' discharges in excess of the effluent limitations. Furthermore, Mr. Galinsky owns a home in the vicinity of the facility. The complaint alleges that the value of his home, as well as his enjoyment of it, has been adversely impacted by the odors from the sewage plant. In addition to Messrs. Galinsky and Dievendorf, another of plaintiff's members, James Abbott owns a home in Johnstown, and allegedly pays higher sewer

1. 33 U.S.C. § 1311(a) provides:

"Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

2. 33 U.S.C. § 1317(d) states:

"After the effective date of any effluent standard or prohibition or pretreatment standard promulgated under this section, it shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition or pretreatment standard."

3. New York State Environmental Conservation Law § 17–0825 provides:

"Persons discharging industrial waste to a publicly owned treatment works shall comply with toxic effluent standards and pretreatment standards and to monitoring, reporting, recording, sampling and entry requirements provided by the [Clean Water Act] or adopted pursuant thereto."

4. It is undisputed that the Cayudetta Creek is a navigable water of the United States as that term is defined in 33 U.S.C. § 1362(7).

use fees and taxes as a result of the defendant's discharges.

Prior to filing their complaints, however, plaintiffs served both Twin City Leather and Colonial Tanning with an intent to sue letter. Each such letter adequately identified the limitations allegedly violated by the particular defendant, the activities constituting the violations, the persons liable and the location of the alleged violation. Additionally, these letters specifically identified dates of violations for certain parameters beginning in January, 1989. However, in the concluding paragraphs of each letter, plaintiffs advised defendants that they intended to seek penalties "for each violation of the Wastewater Discharge Permit during the period of five years and sixty days preceding the institution of the lawsuit...." (*See Colonial Tanning Complaint*, Exhibit A, 90–CV–896; *Twin City Leather Complaint*, Exhibit A, 90–CV–801).

The complaint in the Colonial Tanning action was filed on August 14, 1990, and the complaint in the Twin City Leather action was filed on July 17, 1990. Like the intent to sue letters, the complaints identified specific dates of violations from January of 1989 to various dates in 1991. Both complaints allege in the first cause of action that

"Defendants [sic] pollutant discharges are listed in the Notice of Intent to Sue Letter annexed hereto as Exhibit "A", and those which have been committed after March 31, 1990 ... are violations of defendant's wastewater discharge permit and/or federal categorical pre-treatment standards, and are violations of Section 301(a) and 317(d) of The Act, 33 U.S.C. 1311(a) and 1317(d)." (*Colonial Tanning* Complaint at ¶ 32; *Twin City Leather* Complaint at ¶ 32).

Neither complaint alleges violations of the limitations prior to January of 1989. However, in the ad damnum clauses, each complaint sought penalties for all violations of the effluent limitations from a date five years and sixty days preceding the date of the complaint's filing.

**(b) Plaintiffs' Motions:**

In their motion against defendant Colonial Tanning, 90–CV–869, plaintiffs asserted that the records of the JSB indicate that on 362 occasions between December of 1985 and the middle of 1991 Colonial Tanning exceeded the effluent limitations for the following parameters: chromium, lead, sulfide, hexavalent chromium, phenolics and pH levels. Plaintiffs served Colonial Tanning with interrogatories concerning these 362 exceedences. In support of their motion they argued that Colonial Tanning's responses were inadequate and, therefore, constituted a failure to contest the factual allegations. However, plaintiffs recognized that a motion to compel responses to the interrogatories would be in order.

In response to plaintiffs motion, Colonial Tanning argued first that the violations allegedly occurring prior to January of 1989 are not within the subject matter of the lawsuit because they were not listed in the complaint or the intent to sue letter. Second, Colonial Tanning argued that it has no source of hexavalent chromium, phenolics, or lead. Finally, as to the alleged pH violations, Colonial Tanning disputed the sampling techniques of the JSB and therefore the accuracy of its records.

In their motion against defendant Twin City Leather, 90–CV–801, plaintiffs asserted that the records of the JSB indicate that on 529 occasions between January, 1986 and early, 1991 Twin City Leather exceeded the effluent limitations for the following parameters: chromium, lead, sulfide, hexavalent chromium, phenolics and pH levels. Plaintiffs served Twin City Leather with interrogatories concerning the 529 exceedences. Once again, while recognizing that a motion to compel would be in order, plaintiffs argued that plaintiffs' responses to the interrogatories were inadequate, and therefore constituted a failure to contest the factual allegations.

In response to the interrogatories, Twin City Leather argued that the violations allegedly occurring prior to January, 1989 are not within the subject matter of the lawsuit. Additionally, Twin City asserted that because the interrogatories were based upon the records of the JSB it could neither confirm nor deny the allegations without further discovery.

### (c) Defendants' Motions: [5]

In their cross-motions for summary judgment, defendants Colonial Tanning and Twin City Leather argued that plaintiffs lacked standing to bring the instant actions. They argued first that plaintiffs had not suffered an injury-in-fact, and second that any asserted injury was not fairly traceable to the allegedly unlawful conduct. In support of their second argument, defendants submitted affidavits from Richard S. Hogan, the facility manager, which states that during the relevant time periods the facility had not exceeded its own limitations for chromium or sulfide. Defendants therefore argued that since the facility had not exceeded the limitations for those parameters, plaintiffs asserted injuries are not fairly traceable to defendants' exceedences of either the chromium or sulfide limitations. In opposition to defendants' cross-motions, and in support of their own motions, plaintiffs asserted that they did have standing, and that it was not necessary to demonstrate that the facility exceeded its limitations in order for them to satisfy the fairly traceable element.

Finally, defendants argued that prior enforcement actions commenced by the JSB in the Gloversville City Court constituted a bar to the instant actions under 33 U.S.C. § 1365(b)(1)(B). Plaintiffs responded to this argument by asserting that only enforcement actions commenced by the EPA or the State of New York constituted a bar to a citizen suit under 33 U.S.C. § 1365(b)(1)(B), and that the enforcement action by the JSB was therefore insufficient to bar the instant actions.

### (d) Prior Ruling:

Since defendants contested the scope of the complaint, the court considered that issue first. The court stated that because plaintiffs had failed to move to amend the complaint to include pre-January 1989 exceedences, it would "deal only with the exceedences alleged in the notice of intent to sue." *See Transcript of Oral Decision of 4/13/92* at p. 2 [court docket # 32]. As for defendants'

argument that the prior enforcement proceedings constituted a bar to the instant actions, the court suggested that the Second Circuit's ruling in *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57 (2d Cir.1985), dictates rejection of this argument. However, the court found that since defendants failed to present evidence of the specific exceedences for which it was subjected to prior enforcement proceedings, summary judgment was inappropriate on this basis. *Id.* at p. 9.[6]

In considering the standing issue, the court recognized that at a constitutional minimum, to establish standing a plaintiff must (a) claim to have suffered an injury in fact, (b) which is fairly traceable to the defendants' allegedly illegal conduct, and (c) is likely to be redressed by a favorable outcome. *Id.* at p. 3. After considering the allegations in the complaint and the evidence presented, relying on *Friends of the Earth v. Consolidated Rail Corporation, supra,* the court found that the plaintiffs satisfied the "injury in fact" element. *Transcript* at p. 4. However, as to the "fairly traceable" element the court found that the plaintiffs had failed.

As to that second element, the court explained that "the question is not whether the defendants' exceedences caused the facility to violate its effluent standards, but rather whether the defendants' pollution reached the Cayudetta Creek in excess of the legal limits." *Id.* at p. 7. Continuing with its decision, the court stated that "whether the facility exceeded its limitations is a material fact which is dispositive of the issue of whether the pollutants reached the creek in unlawful amounts." *Id.* Because defendants had come forward with uncontradicted evidence that the facility had not exceeded its limitations as to sulfides and chromium, the court found that the plaintiffs' injury was not fairly traceable to the defendants' alleged violations of those parameters. As to the remaining violations, the court found that summary judgment was not proper because there were questions of fact remaining.

---

**5.** In all material respects, defendants' motions were identical and therefore considered together in the original hearing.

**6.** Defendants have not challenged this specific finding on reconsideration.

Now, after reconsidering its prior analysis in the context of the relevant statutory scheme, and with a better understanding of the interrelationship between the limitations imposed on indirect dischargers and publicly owned treatment works, the court believes that its earlier ruling was in error. For the reasons expressed herein, the court now finds that plaintiffs have met the second element of the standing analysis. Furthermore, the court clarifies its earlier ruling as to the pre-January 1989 violations.

## II

### (a) Standing:

In 1972 Congress established a comprehensive statutory and regulatory scheme, known as the Clean Water Act, in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As part of this scheme, limitations were imposed on the type and amount of certain pollutants which may be discharged into the Nation's navigable waters. However, in 1977 Congress recognized that the "Act's regulatory mechanism for the control of toxins had failed...." *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 790 F.2d 289, 292 (3d Cir.1986). Consequently, the Act was amended in that year to address the regulatory deficiencies.

One aspect of the 1977 amendments was the requirement that sources discharging waste into publicly owned treatment works (POTW) pretreat their waste. Section 307(b)(1) of the Act, 33 U.S.C. § 1317, directs the Administrator of the EPA to establish categorical pretreatment standards for the introduction of pollutants into POTWs. This illustrates Congressional recognition of the fact "that the pollutants which some indirect dischargers release into POTWs could interfere with the operation of the POTWs, or could pass through the POTWs without adequate treatment." *National Association of*

*Metal Finishers v. Environmental Protection Agency*, 719 F.2d 624, 633 (3d Cir.1983), *rev'd on other grounds sub nom, Chemical Mfrs. Ass'n. v. N.R.D.C., Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). Implicit in the establishment of categorical pretreatment standards for indirect dischargers was a recognition of the fact that both the indirect source and the POTW are independent polluters.[7] With the advent of the 1977 Amendments each polluter must separately comply with its own pollution limitations.

As explained by the court in *International Union, U.A.W.*, when formulating these categorical pretreatment standards,

"[the] EPA compared the percentage of each regulated pollutant that a POTW can remove from the wastestream with the percentage that a direct discharger using the best available technology can remove. [46 F.R.] at 9407, 9415 [(1981)]. Where POTWs were found to be less efficient than direct dischargers at removing a regulated pollutant, EPA calculated the maximum concentration of that pollutant (i.e. the categorical standard) that can be present in an indirect discharger's wastewater without preventing attainment of the mandated parity in removals." 740 F.Supp. at 1081.

Consequently, it is clear that the categorical pretreatment standards are not merely isolated limitations on an indirect source's discharge. These standards are based upon the POTW's efficiency of removing certain pollutants, and are therefore an integral part of the overall regulatory scheme designed to reduce water pollution. If either polluter, the indirect discharger or the POTW, exceeds its effluent standards, this integrated regulatory scheme will break down. Accordingly, even assuming that a POTW maintains its efficiency at removing a regulated pollutant and does not exceed its own effluent limitations, an indirect source's violation of the pretreatment standards necessarily con-

---

7. *See generally International Union, U.A.W., et al. v. Amerace Corp., Inc.*, 740 F.Supp. 1072, 1082 (D.N.J.1990) (if violations of categorical pretreatment standards were not actionable without proof of POTW's violation, the pretreatment standards would be superfluous); *and New York Pub-*

*lic Interest Research Group v. Limco Mfg. Corp.*, 697 F.Supp. 608, 611 (E.D.N.Y.1987) (plaintiffs in citizen suit have standing to sue indirect discharger where it is alleged that the discharge affects the environmental interest in the waterway).

tributes to water pollution in an amount greater than the law permits.

■ Therefore, the statutory scheme dictates that an indirect source must be treated as an independent polluter. Based upon the relationship between the pretreatment standards and the efficiency of the POTW, it is clear that the protection of the environment is dependent upon the compliance of both the POTW and the indirect discharger. Therefore, the POTW's compliance with its permit limitations neither absolves an indirect source's violation of categorical pretreatment standards, nor prevents the introduction of such pollutants into the Nation's waterways. It simply means that the POTW, as an independent polluter, did not contribute to water pollution any more than it is allowed to.

■ Based upon a clearer understanding of this integrated regulatory scheme, the court now finds that it was error to rule that plaintiffs' injuries are not fairly traceable to the defendants' allegedly unlawful conduct. The granting of a motion for reconsideration is clearly within the discretion of the court whose order is the subject of the motion. *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983). Reconsideration is warranted where, as here, a party demonstrates that the earlier ruling was premised upon a misunderstanding of a relevant regulatory scheme.

■ Therefore, the court now finds that the relevant question is not, as previously stated, whether the defendants' pollutants reached the Cayudetta Creek in "unlawful amounts". Instead, if (1) defendants' discharges exceeded the effluent standards, (2) the pollutants reached the waterway, and (3) those pollutants are of the type which cause the "injury" sustained by the plaintiffs, then the "injury in fact" is fairly traceable to the defendants' violation. *See Public Interest Research Group of New Jersey v. Powell Duffryn Terminals*, 913 F.2d 64, 72 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Natural Resources Defense Council, Inc. v. Watkins*, 954 F.2d 974 (4th Cir.1992). Based upon this formulation, plaintiffs' satisfy the fairly traceable element.

In support of their motion for reconsideration, plaintiffs have also produced the affidavit of Ward Stone, the head of the New York State Department of Environmental Conservation Wildlife Pathology Unit at the Wildlife Resources Center, Delmar, New York. ("Stone Affidavit"). Mr. Stone states in his affidavit that he has concluded, based upon various studies of the Cayudetta Creek, that chromium and other heavy metals discharged by defendants are present in the Creek and account for the type of injuries alleged in the complaint. This affidavit was not presented to the court prior to the instant motion, and there is no indication that it was unavailable at that time. Therefore, it will not be considered at this stage.

Nonetheless, this does not defeat a finding that the plaintiffs have standing under the citizen suit provision of the Act. The Stone Affidavit suggests a relationship between the pollutants unlawfully discharged by defendants and the type of injury alleged. However, defendants did not challenge this relationship in either their opposition to plaintiffs' motions for summary judgment or their own cross-motions for summary judgment. Therefore, the court's earlier ruling was not based upon plaintiffs' failure to demonstrate such a relationship.

Finally, defendants did not challenge the third element of the standing analysis—that is, whether plaintiffs' injuries are redressable by the relief sought in the complaint. Consequently, the court has not previously ruled that plaintiffs have satisfied this element. Nevertheless, it is clear to the court that the relief sought will redress the injuries alleged in the complaint, and that plaintiffs therefore have standing to bring the instant action.

**(b) Scope of the Complaint:**

Defendants refused to answer plaintiffs' interrogatories on the ground that violations alleged to have occurred prior to January of 1989 were beyond the scope of the complaints and the intent to sue letters. Because it was their position that such violations were beyond the scope of the complaints, defendants argued that summary judgment could not be granted to plaintiffs on the alleged pre-January 1989 violations.

Plaintiffs failed to respond to this argument. Instead, plaintiffs asserted that defendants failure to respond indicated a failure to contest their factual allegations. Nevertheless, as indicated in part I(b) of this opinion, plaintiffs recognized that a motion to compel responses to interrogatories would be in order.

Now on reconsideration, plaintiffs argue that it was error for the court to dismiss, as beyond the scope of the complaints, those claims for violations prior to January, 1989. First, they contend that the court's dismissal of such claims was *sua sponte,* and that they were not given an opportunity to argue that proper notice was given to defendants of the pre-January 1989 violations. Second, they argue that both the intent to sue letters and the complaints placed defendants on notice of their intent to sue for violations prior to January, 1989.

First, the court notes that its orders entered on June 30, 1992 were in error inasmuch as they "dismissed" plaintiffs' claims for pre-January 1989 violations of effluent limitations. The court's ruling from the bench was that on the cross-motions for summary judgment it would consider only those alleged exceedences listed in the intent to sue letters or the complaints. Therefore, any claims for pre-January 1989 violations which may be within the scope of the complaint are not dismissed.

Second, defendants are correct in asserting that there are no factual allegations, either in the complaints or in the intent to sue letters, that defendants violated the effluent limitations prior to January of 1989. Indeed, as noted in part I(a) of this opinion, the first cause of action in the complaints only alleged that defendants' exceedences listed in the intent to sue letters and the complaints, and those which have occurred **after** March 30, 1990 are violations of the Act. However, as plaintiffs point out, both the ad damnum clauses of the complaints and the intent to sue letters state that plaintiffs seek penalties for all violations occurring within five years and sixty days of the complaints' filing. While plaintiffs have not amended their complaints to include factual allegations of pre-January 1989 violations, defendants were

certainly on notice of plaintiffs' intention to hold them responsible for such violations.

Without commenting on the scope of the complaint, at this time the court denies plaintiffs motions for summary judgment. If plaintiffs are dissatisfied with defendants' responses to the propounded interrogatories, they should file a motion to compel. Defendants are clearly contesting the scope of the complaints, however, as plaintiffs correctly point out, that issue was not presented previously. Therefore, it should not be decided here, on a motion for reconsideration. The denial of plaintiffs' motions, however, is without prejudice.

## CONCLUSION

Having considered the arguments advanced on plaintiffs' motions for reconsideration in the above captioned actions, the court finds that its earlier decisions were in error. Therefore, the court grants plaintiffs' motions for reconsideration and vacates the orders entered on June 30, 1992 in *Atlantic States Legal Foundation v. Colonial Tanning,* 90–CV–896, and *Atlantic States Legal Foundation v. Twin City Leather,* 90–CV–801.

For the reasons expressed in part II(a) of this decision the court finds that plaintiffs have standing to sue under 33 U.S.C. § 1365, notwithstanding defendants' proof that the facility did not violate its effluent standards for pH, sulfides, and chromium; and therefore defendants' cross-motions for partial summary judgment are now denied.

For the reasons expressed in part II(b) of this decision the court finds that it was error to dismiss plaintiffs' claims for pre-January 1989 violations of effluent standards. However, because the issue of the complaints' scope was not properly presented at the time of the original motions for summary judgment, the court will not grant plaintiffs' motions for summary judgment based upon defendants' failure to respond to interrogatories concerning pre-January 1989 violations. Therefore, for the reasons stated above,

plaintiffs' motions for summary judgment are denied without prejudice at this time.

**IT IS SO ORDERED.**